577 A.2d 225

**CITY OF PHILADELPHIA, Petitioner,**

v.

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF ENVIRONMENTAL RESOURCES, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 5, 1990.

Decided June 25, 1990.

Patrick K. O'Neill, Chief Asst. City Sol., for petitioner.

Louise S. Thompson, Asst. Counsel, Philadelphia, for respondent.

Before CRAIG and COLINS, JJ., and SILVESTRI, Senior Judge.

SILVESTRI, Senior Judge.

This is an appeal from an order of the Environmental Hearing Board (Board) upholding a determination of the Department of Environmental Resources (DER) that the City of Philadelphia (City) was not eligible for $571,647.00 in grant funding for the construction of a compressor building at the City's Southeast Water Pollution Control Plant (Plant). We affirm.

On April 18, 1978, the City acting through its Water Department, applied for a grant under the Federal Clean Water Act (Act), 33 U.S.C. § 1251 *et seq.*, for construction of a wastewater treatment plant. The federal grants program was administered by the United States Environmental Protection Agency (EPA) and the DER. On September 27, 1979, the City was awarded a grant to finance *inter alia,* 75 percent of the cost of the compressor building at the Plant.

The federal funding was limited to the lowest bids received. The City was required to submit final plans and specifications for DER and EPA's approval before bids

could be solicited and contracts awarded. On August 4 and 12 of 1981, the EPA and DER approved the City's plans and specifications for a compressor building at a proposed 140 MGD [1] Plant. The City received bids from contractors for the compressor building on August 4, 1981.

By September of 1981, the City became aware of developments which it believed warranted careful reexamination of the scale of the Plant. These developments included: (1) information from the 1980 census which showed a considerable population decline in the areas serviced by the Plant; (2) the implementation of a leak detection program; and (3) a concern about mounting capital costs. The EPA and DER permitted the City to examine the possibility of reducing the capacity of the Plant from 140 to 100 MGD. The goal of the City was to reduce the operating expenses and construction costs without an adverse effect on the environment.

The proposed compressor building was to house equipment utilized to force pure oxygen into the wastewater to be treated at the Plant. The parties agree that the design of the compressor building may be directly affected by the proposed capacity of the Plant, *i.e.*, a compressor building at a relatively smaller plant may be designed to house less equipment than a similar facility at a larger plant. The City enlisted the aid of its design consultants, Greeley & Hansen, to investigate possible design alternatives for the compressor building.

On October 7, 1981, the EPA contacted the City by letter to inquire whether the possibility of reducing the capacity of the Plant would affect the proposed contracts for the compressor building. On October 16, 1981, a meeting between EPA, DER and the City was held and the time necessary for reevaluating the design of the plant was discussed. On October 20, 1981, the City wrote to the EPA: "[i]t is our opinion that at the present time, we should defer from responding to the question in your letter of October 7 until such time as EPA, DER and the City are in complete

1. The plans as proposed called for the Plant to have a capacity of 140 million gallons per day (MGD) of sewage effluent.

agreement as to the direction we should undertake to construct a Water Pollution Facility at the Southeast Plant."

On October 21, 1981, the EPA wrote to the City to express its approval of the City's proposal to investigate design alternatives. The EPA also notified the City that it must continue to comply with the present consent decree unless it is modified.[2] The EPA anticipated receiving more concrete suggestions from the City in about three weeks.

On November 9, 1981, the City wrote to the EPA to provide an update on the options it had examined. However, the City advised that its investigation of the alternatives was not complete and that they would present a program within two weeks.

On or about November 23, 1981, Greeley & Hansen provided the City with a more complete identification and analysis of the design alternatives. The City sent a letter to EPA and DER on December 4, 1981 outlining the proposals for the revised design capacity of the Plant. The City set forth nine alternatives for review by the agencies.

The bids for the compressor building had expired on December 3, 1981.[3] Although the City requested an extension of the bid award period, the low bidder for the general construction/mechanical work withdrew its bids on December 4, 1981. Other bidders for the work on the compressor building consented to an extension of the award period.

On January 18, 1982, the EPA wrote to the City following its review of the alternatives. The EPA eliminated five of the nine proposed alternatives and inquired as to the City's preference regarding the remaining four alternatives. Of the remaining design options, two, if selected, would have

2. In mid–1981, the City was in the process of upgrading its three sewage treatment plants under a 1978 Consent Decree with EPA and DER.

3. The stipulations of the parties refers to December 3 rather than December 2, 1981. However, if the bids were opened on August 4, the statutory 120 day (counted in accordance with 1 Pa.C.S. § 1910) would appear to expire on December 2. 73 P.S. § 1622.

necessitated changes in the compressor building in connection with the design of the 140 MGD plant design.

On February 9, 1982, although the City requested an extension of the bid award period, the low bidder for the plumbing work withdrew its bid. The remaining bidders consented to an extension of the award period. On March 2, 1982, the City wrote to advise the DER that the low bidders for the general construction/mechanical and plumbing work had exercised their options to withdraw their bids. The City proposed to award these contracts to the next lowest bidders rather than·rebid the contracts due to the potential significant cost increase associated with inflation.

On March 23, 1982, the City outlined in detail its preferred alternative for a 100 MGD plant. Although the preferred design change involved a reduction in plant capacity from 140 to 100 MGD, there was no change in the design of the compressor building. The City estimated that the proposed alternative would reduce capital costs by $13.3 million and the annual operating cost by $200,000.

The DER wrote to the City on March 31, 1982 to inform it that the bids on the compressor building had been reviewed and approved. The DER then authorized the City to award contracts on the compressor building to "the low responsive bidders, as indicated by the proposals you submitted."

On May 20, 1982, the EPA wrote to the City advising that federal funding of the Plant would be limited to the lowest bids received for the general construction/mechanical and plumbing work contracts for the compressor building. The $762,196 difference between the original low bids and the second low bids, eventually awarded by the City, was not eligible for 75% funding participation. The effect of the decision deprived the City of $571,647 in grant funding.

On August 31, 1982, the City wrote to the EPA and DER requesting that the agencies reconsider the determination of partial funding ineligibility in light of the substantial overall monetary savings achieved by the redesign of the plant. The DER wrote to the EPA on December 8, 1982

stating, "we do not plan to change our decision of ineligibility." The DER opined that if the City had acted in a timely fashion, a final decision concerning the compressor building could have been made prior to the expiration of the contractor's bids.

The EPA informed the City on January 13, 1983 that the DER had reconfirmed its funding determination. The City filed a Notice of Appeal with the Board on February 14, 1983 contesting DER's decision refusing to reconsider its prior ruling of partial ineligibility.

A hearing was held in Philadelphia on December 11, 1985. The Board member originally assigned the case resigned without having prepared an adjudication. On March 24, 1989, the parties filed a joint request with the Board to issue an adjudication. The case was reassigned and the Board issued its adjudication and order on June 6, 1989.

■■ The Board dismissed the City's appeal having concluded that the DER's disallowance of the increased costs was not an abuse of discretion. The City filed its petition for review on July 6, 1989. We note that our scope of review is limited to determining whether constitutional rights were violated, errors of law were committed, or any necessary findings of fact were not supported by substantial evidence. *Department of Environmental Resources v. Leon E. Kocher Coal Co.*, 9 Pa.Commonwealth Ct. 110, 305 A.2d 784 (1973).

The City had the burden of showing by a preponderance of the evidence that the DER abused its discretion in disallowing $762,196 in costs. *See* 25 Pa.Code § 21.101. The regulations adopted pursuant to the Act authorize the EPA, or delegated State agency such as DER, to take appropriate action if it determined that the recipient of a grant "has failed to make good faith efforts to meet its obligations under the grant." 40 C.F.R. § 35.935–1; *See* 25 Pa.Code §§ 103.2, 103.4. The regulations also provide that one of those appropriate actions is disallowance of project costs "directly related" to the recipient's noncompliance

with its obligations. 40 C.F.R. § 35.965; *See* 25 Pa.Code §§ 103.2, 103.4.

 While the regulations contain no specific provisions regarding the lapsing of bids, the Board implied an obligation to keep project costs as low as possible. *See* 40 C.F.R. § 35.350(a) and § 35.805–1, § 35.835–6, § 35.917(b), § 35.925–7 and Part 35, Subpart E, Appendix A. The contracts were to be awarded to the lowest responsible bidder. 40 C.F.R. § 35.840(b), § 35.938–4(b); Section 2 of the Act of November 26, 1978, P.L. 1309, *as amended*, 73 P.S. § 1622. Even in the absence of a statutory requirement, public policy and economical conduct of governmental business require that contracts be awarded to the lowest responsible bidder. *American Totalisator Company, Inc. v. Seligman*, 27 Pa.Commonwealth Ct. 639, 367 A.2d 756 (1976).

DER claims that the City failed to meet this obligation when it let the lowest general construction/mechanical and plumbing bids on the compressor building expire. DER concluded that the increased project costs of $762,196 were directly related to the City's failed obligation and thus properly disallowed. The City argues that the time expended on the reevaluation and the resulting overall savings far outweigh the additional costs cited by the DER.

 The Board affirmed DER's conclusion that if the City had acted in a timely fashion, a final decision concerning the Compressor Building could have been made prior to the expiration of the contractor's bid. The Board abuses its discretion only when it makes findings which are not supported by substantial evidence; substantial evidence is relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Marcon Inc. v. Pennsylvania Department of Environmental Resources*, 76 Pa.Commonwealth Ct. 56, 462 A.2d 969 (1983).

The City's failure to make good faith efforts included the failure to complete its reevaluation in a timely manner. The City was granted permission to examine the possibility

of reducing the plant as early as September of 1981. The City was notified of the agencies' concerns regarding the effect the design modifications would have on the proposed contracts for the compressor building on October 7, 1981. The agencies requested the information as soon as possible, as it was the only obstacle preventing the agencies from authorizing the City to award the contracts.

On October 21, 1981, the agencies reminded the City that it was obligated to continue to comply with the present consent decree unless it was otherwise modified. The agencies suggested that if the City's review showed that changes in the decree were needed, the agencies would discuss the changes. The City failed to provide any evidence that the agencies had agreed to waive or modify the consent decree.

On November 9, 1981, the City presented the agencies with alternatives. While the City's initial presentation occurred within the three week limit imposed by the agencies for presenting "the most cost-effective system consistent with State and Federal requirements," the reevaluation was, by the City's own admission, incomplete. The City promised to present a cost-reduction program within the following two weeks which still would have allowed time to award the contracts before the bids expired on December 3, 1981. The City failed to offer any explanation why it did not complete the reevaluation within the prescribed time period.

The review process was unnecessarily prolonged by the City which submitted nine options for the agencies to consider. The City knew or should have known that the five "bubble" options [4] would likely be rejected for environmental reasons. At no time did any agency representative tell the City it could propose alternatives which would violate the existing statutory and regulatory treatment standards.

---

**4.** The "bubble" theory called for the plant to only provide primary effluent treatment instead of secondary treatment as required by existing statutory and regulatory standards. No "bubbling" regulation for waste water discharges has ever been promulgated.

However, the "bubble" concept was essential to five of the nine options submitted by the City.

The City also failed to make good faith efforts to meet its obligation by its failure to indicate which of the options was its preferred alternative. As a result, the agencies' own review process was prolonged since the agencies had to initially weigh all the alternatives equally and then draw some conclusions which the City should have already drawn.

The City did not evaluate the potential costs of the options available to it when it was clear it would not complete its reevaluation before the low bid expired. Instead of considering the likely costs of each course of action and proceeding with the alternative which would cost least in public funds, the City appears to have simply ignored the bid expiration question. The City also did not exercise good faith efforts because it failed to request guidance from the regulatory agencies when it became evident the bid award period would expire.

The fact that the City achieved substantial savings as a result of the reanalysis of the Plant capacity is irrelevant, since there was no change in the design of the compressor building. The overall monetary savings were derived from changes made in other aspects of the Plant unrelated to the design of the compressor building. The increased costs associated with the construction of the compressor building did not result from the overall monetary savings achieved by the redesign of the Plant, but by the untoward delay by the City.

The Board's findings that the City failed to make good faith efforts to meet its obligation to keep the costs of the grant approved project as low as possible is supported by substantial evidence. The Board's conclusion that the expiration of the general construction/mechanical and plumbing bids was directly related to the City's noncompliance is similarly supported by substantial evidence. Accordingly, since the Board has not committed an error of law and

there are no constitutional violations alleged, the decision of the DER is affirmed.

## ORDER

AND NOW, this 25th day of June, 1990, the order of the Environmental Hearing Board is hereby affirmed.

CRUMLISH, Jr., former President Judge, did not participate in the decision in this case.